# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|                        |   |                        |
|------------------------|---|------------------------|
|                        | * |                        |
| **GEORGE J. KAFKA, JR.,** | * |                     |
| **Plaintiff**          | * |                        |
| **v.**                 | * | **CIVIL NO. JKB-16-1757** |
| **GLADYS C. HESS,**    | * |                        |
| **Defendant**          | * |                        |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

### I. Background

This case began as a one-count complaint filed on May 31, 2016, by Plaintiff George J. Kafka, Jr., for declaratory judgment against his aunt, Defendant Gladys C. Hess. (ECF No. 1.) Nearly two months later, Hess filed suit for both declaratory relief and damages against Kafka in Maryland state court, and that case was removed to this Court. (16-2789, ECF Nos. 1, 2.) After dismissing all of Hess's complaint in 16-2789 except for the unjust-enrichment count and denying her motion to remand, and after denying Hess's motion to dismiss Kafka's complaint in 16-1757, the Court consolidated the two cases. (16-2789, ECF Nos. 25, 26, 29; 16-1757, ECF Nos. 7, 8.) Pending before the Court in this consolidated case are a motion for summary judgment filed by Kafka (16-1757, ECF No. 10[1]), and a motion by Hess and her children, Gail A. Kroedel, Roland Stader, and Linda Zuck, to dismiss Kafka's counterclaim and third-party claim against them (ECF No. 18). For ease of reference in this memorandum opinion, Hess and her children will be referred to, collectively, as Hess Defendants, even though Hess is actually a

---

[1] Hereinafter, all citations will be to the docket in 16-1757, unless otherwise noted.

plaintiff in 16-2789, the case that, strictly speaking, contains Kafka's counterclaim against Hess and third-party claim against Kroedel, Stader, and Zuck.

The two motions have been briefed (ECF Nos. 16, 17, 21, and 22), and no hearing is required, Local Rule 105.6 (D. Md. 2016). Kafka's motion for summary judgment will be granted as to both Kafka's complaint in 16-1757 and as to the remaining count of Hess's complaint in 16-2789; the Hess Defendants' motion to dismiss the counterclaim and third-party claim in 16-2789 will be granted in part and denied in part. The Court will first consider Kafka's motion for summary judgment and the evidence upon which it is based. Following that, the Court will address the Hess Defendants' motion to dismiss Kafka's counterclaim and third-party claim (hereinafter referred to, collectively, as the counterclaim).

## II. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir.

2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

### III. *Evidence Pertaining to the Motion for Summary Judgment*

In his affidavit, Kafka avers he is retired and living in North Carolina. (Mot. Summ. J. Ex. 1, Kafka Aff. ¶ 2 (undated; filed Nov. 26, 2016), ECF No. 10-1.) Kafka is the only son of Dorothy J. Smith ("Smith"), who passed away March 31, 2015. (*Id.* ¶ 3.) Smith executed a durable power of attorney on September 17, 1999, appointing Kafka as her agent. (*Id.* ¶ 4.) Over a period of many years, Kafka knew that Smith and her husband, Emory H. Smith, Jr., who was Kafka's stepfather, planned for Kafka to become sole owner of all their property upon their deaths. (*Id.* ¶¶ 4, 5.) In 2003, the Smiths made Kafka a joint owner of their bank account at Bay Vanguard Federal Savings Bank, and in 2008, they made him a joint owner of their money market account, also at Bay Vanguard. (*Id.* ¶ 4.) Kafka was also made a beneficiary of an Individual Retirement Account ("IRA") at Bay Vanguard and a beneficiary of the Smiths' insurance policies. (*Id.*)

Emory Smith, Kafka's stepfather, passed away on June 2, 2009, making Dorothy Smith the sole owner of their residential property at 7313 Geis Avenue, Baltimore, Maryland (the "Property"). (*Id.* ¶¶ 3, 5.) During the preceding two-month period in which the stepfather's health was failing, Kafka traveled back and forth between North Carolina and Maryland. (*Id.* ¶ 5.) Kafka attended the funeral. (*Id.*) On June 9, 2009, Smith executed a deed, which had been drafted by her attorney, Raymond Rudacille, granting herself a life estate in the Property with the

remainder to Kafka. (*Id.* ¶ 6; Ex. 2, Deed June 9, 2009, ECF No. 10-2.) That deed was recorded by the attorney on April 30, 2010. (Kafka Aff. ¶ 7; Deed June 9, 2009.)

On April 23, 2009, prior to the stepfather's death, and upon Rudacille's recommendation and that of Kelly Bowman, who was an employee of Bay Vanguard, Kafka and Smith withdrew $209,051.08 from the jointly held money market account at Bay Vanguard. (*Id.* ¶ 8.) Kafka deposited the money in his bank account in North Carolina. (*Id.*) But after the stepfather died, Smith asked her son to bring the funds back to Maryland; Kafka traveled from North Carolina and on July 21, 2009, wrote a check to Smith and helped her to deposit it back into their joint account at Bay Vanguard. (*Id.*) "The amount of the check was $198,000, slightly less than the amount previously withdrawn (at [Kafka's] mother's request)." (*Id.*) On or about January 25, 2010, Kafka received a letter from a Maryland attorney, Rob Goldman, indicating that Kafka's durable power of attorney for Smith had been revoked. (*Id.* ¶ 9.) In addition, Goldman wrote, "'I have been instructed to put you on notice that if you attempt again to convert any of [Smith's] funds or continue to call her after she has asked you not to, appropriate legal action will be taken.'" (*Id.*) Kafka states he had never converted any of his mother's funds or called her after she had asked him not to do so. (*Id.*) From that point forward, Kafka states he was restricted from seeing or communicating with Smith "in every way" by his mother's sister, Gladys C. Hess. (*Id.* ¶ 10.)

Hess notified Kafka of Smith's death and indicated there was no need for Kafka to come to the funeral, but Kafka did come, driving all night to get there. (*Id.* ¶ 11.) While in Maryland, he saw that most of the valuable personal property in Smith's home was missing. (*Id.*) In addition, after Smith's funeral, Kafka and his wife went to Smith's home, but Hess demanded

they leave.  (*Id.*)  Kafka states, "I was unsure of my rights and, given the circumstances, I elected to stay away from Maryland and Gladys Hess."  (*Id.* ¶ 12.)

In early 2016, Kafka learned Hess was trying to sell the Property.  (*Id.* ¶ 13.)  Hess contacted Kafka and indicated a title search revealed the 2009 deed in Kafka's favor.  (*Id.* ¶ 14.)  Kafka contacted the same prospective buyers in an effort to sell the Property to them, but a 2011 deed for the Property made title underwriters unwilling to insure the title, leaving Kafka unable to sell it.  (*Id.* ¶¶ 15, 16; Ex. 3, Deed Aug. 4, 2011, ECF No. 10-3.)  The 2011 deed by Smith purported to convey a life estate to Smith and the remainder to Hess, contingent upon Smith's not having exercised her reserved power of disposition during her lifetime.[2]  (Deed Aug. 4, 2011.)  Attorney Tara K. Frame authored a letter dated May 19, 2016, on Hess's behalf to Kafka; Frame wrote,

> [P]rior to Ms. Hess learning of the previously executed deed, she had spent a substantial sum of money getting the property ready for sale. . . . [Hess] has had to deal with maintaining the property and expending monies to repair and renovate the property for sale out of her own funds.  She has had to deal with hiring and working with the real estate agent to list the property.  In light of the time and effort that Ms. Hess has invested in this property, she believes she should receive 50% of the net proceeds from the sale of the property, in addition to reimbursement for the monies she has spent on the property since Ms. Smith's death in March of 2015.

(Ex. 4, Frame Letter, ECF No. 10-4.)  Attached to the letter was a list of each expenditure Hess had made, totaling $71,336.30.  (*Id.*)  Frame requested Kafka contact her to discuss the matter. (*Id.*)

Hess's opposition to Kafka's motion "concedes that the Hess Deed was filed in the land records after the Kafka Deed."  (Def.'s Opp'n 5, ECF No. 16.)  In her affidavit, she states that she believed Smith's home belonged to her after Smith's death and, based on that belief, she spent money "maintaining the Property, as well as getting the Property ready to be placed on the

---

[2]  Smith did not reserve for herself a power of disposition when she executed the 2009 Deed.

market for sale." (*Id.* Ex. 1, Hess Aff. ¶¶ 5, 8, Dec. 12, 2016, ECF No. 16-1.) Hess authorized Frame to send the letter to Kafka "in order to resolve any dispute between Mr. Kafka and [Hess]." (*Id.* ¶ 7.)

## IV. *Analysis of Motion for Summary Judgment*

The two matters at issue in this motion are, first, the priority of the 2009 Deed in which Smith reserved a life estate for herself and granted the remainder to Kafka upon Smith's death and, second, whether Kafka is liable to Hess for the amounts she spent, she says, in getting the Property ready for sale. Since Hess has conceded the priority of the 2009 Deed to Kafka, and since she has presented no argument otherwise on this issue, the Court, accordingly, will enter a judgment so declaring its priority. That is consistent with long-established Maryland law that a grantor can only convey the property interest she possesses. When Smith granted the remainder interest in the Property to Kafka in 2009, she could not later convey the same interest to Hess in 2011. *See In re Bauernschmidt's Estate*, 54 A. 637, 645 (Md. 1903) ("A deed may be good in part. When it purports to convey that which the grantor had no authority to convey as well as to transfer that which he could transfer, it will be good as to the latter though inoperative as to the former."). *See also Hofsass v. Mann*, 22 A. 65, 67 (Md. 1891); *Johnson v. Hines*, 61 Md. 122, 131-32 (Md. 1883).

As to Hess's claim of unjust enrichment, her counsel has filed an affidavit, presumably pursuant to Federal Rule of Civil Procedure 56(d),[3] indicating discovery is needed to resolve the claim. (Def.'s Opp'n, Ex. 2, Farmer Aff. ¶¶ 6, 7, Dec. 12, 2016, ECF No. 16-2.) Specifically, he

---

[3] Rule 56(d) provides:
> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

states, "At this time, it is unknown, without the aid of discovery, the extent and nature of the relationship that existed between Dorothy J. Smith and George J. Kafka, Jr., the reason, if any, for Mr. Kafka's one year delay in asserting his rights, and the value of the benefit conferred on Mr. Kafka. These factors require expert review and will better facilitate the Court's analysis of the balance of equities. Discovery is likely to benefit the just resolution of the above captioned action." (*Id.*)

The Court disagrees that the unjust enrichment claim cannot be resolved now without discovery. Hess has failed to explain satisfactorily why Smith's and Kafka's relationship matters to a determination as to whether Kafka was unjustly enriched by Hess's expenditures on the Property. She also provides no logical reason that Kafka's filing suit in 2016 rather than in 2015, when his mother died, bears upon Hess's claim of unjust enrichment. The only available evidence indicates Kafka was first informed of Hess's expenditures when he received the Frame Letter. His declaratory judgment suit was filed within two weeks of the letter's date, so no delay can be perceived. Finally, Hess has offered no reason she cannot provide evidence relating to the value of any benefit she claims was conferred upon Kafka. She obviously knows what was done to the Property, as set forth in the inventory attached to the Frame Letter, so she is not prevented from providing evidence on value. No good reason exists to delay determination of the unjust enrichment claim.

After reviewing the evidence, the Court concludes Kafka was not unjustly enriched by Hess's making repairs and improvements to the Property. The three elements of an unjust-enrichment claim are as stated in *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007):

1. A benefit conferred upon the defendant by the plaintiff;
2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

"A defendant, however, 'is not unjustly enriched, and therefore not required to make restitution where the benefit was conferred by a volunteer or intermeddler.'" *Id.* at 352 (citing Daniel B. Dobbs, *Handbook on the Law of Remedies* § 4.9 (1973)). This qualifying principle to the doctrine of unjust enrichment "is based on the notion that 'one who confers a benefit upon another without affording that other the opportunity to reject the benefit, has no equitable claim for relief against the recipient of the benefit in the absence of some special policy . . . .'" *Id.* (citing Dobbs, § 4.9). A distinction is drawn between voluntary payment by a plaintiff of a defendant's debt, which ordinarily may be readily rejected or accepted by the defendant, and the voluntary rendering of services or the addition of value to the defendant. *Id.* at 352, 354-55. An "apt example" of the latter is given in *Hill*:

> While the homeowner is away, a house painter paints the entire house, without the owner's consent, thereby adding value to the homeowner's property. The added value of the home cannot be separated easily and returned to the house painter. Therefore, a court should not permit the house painter to recover. Dobbs notes that, although the homeowner is enriched, this result "is preferable to payment of the intermeddler, who should not thus be encouraged to invade another's freedom of choice about his own affairs." DOBBS, *supra*, § 4.9. If, however, the benefit is something that can be easily returned, such as money or personal property, "the fact that it is retained and used is a choice. When this choice is available, the choice principle is satisfied and restitution ... ought to be required." DOBBS, *supra*, § 4.9.

*Id.* at 355 n.12.

The present case is one step removed from Dobbs's hypothetical about the house painter. Here, it is not the house painter, or other type of contractor, who is seeking payment for services rendered. According to Hess, the contractors who made repairs or improvements to the Property have all been paid by her, and it is Hess who is seeking reimbursement from Kafka. Even so,

assuming *arguendo* that the contractors' actions added some value to the Property, Kafka has no option to decline it.  As is true with Dobbs's example of the house painter, Hess has not presented any evidence that the repairs and improvements can be separated easily and returned to the contractors.  Kafka has been given no opportunity to decline whatever benefit to the Property was derived from the contractors' services.  As noted earlier, the Frame Letter clearly indicates that Kafka first learned about the various repairs and improvements to the Property *after* they had been completed.  No evidence indicates he was aware of them beforehand, that he requested the services be undertaken, or that he stood by and silently suffered their rendition.  As the *Hill* opinion indicated, the ability of the defendant to decline the benefit is the essence of the second element of an unjust-enrichment claim.  *Id.* at 354.  Hess has failed to establish the second element.

Hess's endeavor to be reimbursed exposes another frailty in her claim that Kafka has been unjustly enriched.  The measure of recovery in this cause of action "is the gain to the defendant, not the loss by the plaintiff."  *Mass Transit v. Granite Construction*, 471 A.2d 1121, 1126 (Md. Ct. Spec. App. 1984), *quoted in Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*, 843 A.2d 252, 293 (Md. Ct. Spec. App. 2004).  Hess has only posited that Kafka benefited by the same amount she paid various contractors.  But even if she could provide credible evidence of *some* increase in value to the Property, she still has not provided evidence that Kafka has been given a realistic choice to decline that increased value.

In cases where improvements to another's property have resulted in restitution to the one making improvements, the courts have required proof of three elements:  (1) the plaintiff must have held possession of the property under color of title, (2) the plaintiff's possession must have been adverse to the title of the true owner, and (3) the plaintiff must have acted in good faith.

*Bryan v. Councilman*, 67 A. 279, 282 (Md. 1907). "By good faith is meant an honest belief on the part of the occupant that he has secured a good title to the property in question and is the rightful owner thereof. And for this belief there must be some reasonable grounds such as would lead a man of ordinary prudence to entertain it." *Id. See also Welsh v. Welsh*, 255 A.2d 368, 373 (Md. Ct. Spec. App. 1969) ("a person to be a bona fide possessor must not only believe that he has title to the property but it must appear also that he has had no notice of an adverse claim of title by another person or of facts which would require an investigation that would lead to a discovery of the adverse claim").

"'In all these cases, however, the element of good faith and innocent mistake is essential for if a person lays out money on another's property with knowledge or notice of the true state of the title—*e.g.*, a purchaser with notice of another's claim—he has no claim to be reimbursed, and of course no lien.'" *Goldberg v. Ford*, 53 A.2d 665, 668 (Md. 1947) (quoting Pomeroy, *Equity Jurisprudence*, 5th ed., §§ 1241, 1242). Kafka's title to the Property was on record and, by law, that recorded title was notice to Hess. *Frazee v. Frazee*, 28 A. 1105, 1106 (Md. 1894). She has not shown that her failure to learn the true state of affairs with regard to Kafka's title was within the realm of ordinary prudence. *See Bryan*, 67 A. at 282. As a result, Hess cannot show she acted in good faith when she paid for repairs and improvements to the Property; this is especially so given her order to Kafka to leave the Property immediately after Smith's funeral and Hess's subsequent intentional exclusion of him from the Property. Consequently, Hess is not entitled to reimbursement for her expenditures on the Property.

## V. Standard of Dismissal for Failure to State a Claim

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). Although when considering a motion to dismiss a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

## VI. *Allegations of the Counterclaim*

The allegations of the counterclaim largely duplicate the statements made in Kafka's affidavit in support of his motion for summary judgment, and those duplicated will be considered by the Court as though restated in this section of the memorandum opinion. The portions of his affidavit that pertain to the attempted sale of the Property are not included in the counterclaim and, accordingly, will not be considered here. In addition to the duplicative allegations, Kafka alleges that he, his mother, and his stepfather "had a very good and amicable relationship. Mr. and Mrs. Smith had told Mr. Kafka over many years that they planned for him to receive their property when they died." (Counterclaim ¶ 10, ECF No. 13.) The Smiths purchased the Property in 1966. (*Id.* ¶ 9.) As of 2009, the joint accounts at Bay Vanguard had more than $300,000 in them; also, Smith was receiving railroad retirement benefits of approximately $3,000 each month, as well as Social Security benefits. (*Id.* ¶ 14.) Emory Smith became

seriously ill in April 2009, at which time, Smith and Kafka consulted the attorney, Rudacille, about estate planning. (*Id.* ¶ 15.) Although Kafka's stepfather had a will, it was never probated. (*Id.* ¶ 17.)

Smith had received a hip replacement more than twenty years before the stepfather's death in 2009, and she also suffered from arthritis; "she was often in pain (addicted to pain killers) and was housebound, depending on others to shop, take her to doctors, cook and clean. She was not well educated, but could read and write well enough to get by." (*Id.* ¶ 19.) Further, the counterclaim alleges, "While Mr. Kafka had been visiting at least twice/month to assist Mrs. Smith in paying bills, grocery shopping, provide [*sic*] medical assistance and running errands during Mr. Smith's final illness (from April-June 2009), he informed Mrs. Smith after Mr. Smith passed away that he would have to return to his home in North Carolina and could not visit as frequently." (*Id.* ¶ 20.)

Kafka also alleges that after he returned to North Carolina in June 2009, Hess, who had not been a frequent visitor while Emory Smith was alive, "began to involve herself in Mrs. Smith's affairs. Hess began to progressively take control of Mrs. Smith and to restrict Kafka from having anything to do with his mother." (*Id.* ¶ 21.) Kafka alleges it was under Hess's influence that Smith made her request to Kafka in July 2009 to return the funds she and he had withdrawn from the Bay Vanguard account. (*Id.* ¶ 22.) Kafka received information in August 2009 that changes were made to the joint accounts at Bay Vanguard; he "drove to Maryland to spend some time with his mother and investigate." (*Id.* ¶ 23.) He first went to Bay Vanguard and spoke with Kelly Bowman, who "informed him that Mrs. Smith (accompanied by Hess) had 'removed' him from the bank and money market accounts (without his knowledge or consent) and that she could not give him any information about the accounts." (*Id.*) Kafka asked

Bowman "whether Mrs. Smith had also changed her IRA (Mrs. Smith had an IRA account at Bay-Vanguard Federal Savings Bank and Kafka was beneficiary of the account) that had a balance of approximately $50,000 and was told that she had not. He asked who was now on the account(s) and Bowman indicated she could not divulge this information." (*Id.*)

Kafka alleges he elected not to confront his mother immediately and instead returned to North Carolina the same day. (*Id.* ¶ 24.) Some time later, Kafka called his mother to discuss this matter

> and she told him that Kelly Bowman had informed her that he had made a day trip from North Carolina with the intent to "steal her money" and because of this, she had given all of her property to Hess. He immediately contacted Ms. Bowman, who indicated that she had spoken with Mrs. Smith and Hess but adamantly maintained that she had not told them that he had requested any money (as he had not). Kafka then phoned Mrs. Smith and informed her of his conversation with Ms. Bowman. Her reply was that Hess was going to take care of everything.

(*Id.* ¶ 25.) On or about January 15, 2010, Smith executed a will that specifically disinherited Kafka and instead bequeathed her entire estate to Hess, with Hess's daughter named as a contingent legatee. (*Id.* ¶ 26.) Kafka alleges on information and belief that Hess was the one who selected the attorney for this will and who took Smith to see him, without notification to or consultation with Rudacille, who prepared the 2009 Deed. (*Id.*)

Smith also executed a durable power of attorney and advanced directive/health care power of attorney, which made Hess the agent for Smith. (*Id.* ¶ 27.) Those documents were drafted by Goldman, the same attorney who wrote the letter to Kafka informing him that Kafka's power of attorney had been revoked and warning Kafka not to attempt to convert Smith's funds or to call her after she asked Kafka not to do so. (*Id.* ¶¶ 27, 28.)

After Hess became involved in Smith's life, "Hess began to alienate friends and neighbors who had known Mrs. Smith all their lives. She posted several 'no trespassing' signs

on the property (without notifying Mrs. Smith), installed an alarm system and discouraged visitors." (*Id.* ¶ 29.) As to personal property, Kafka alleges,

> At their home, Mr. and Smith kept valuable personal property including a Harley Davidson motorcycle, war pennies, antiques, jewelry, guns, tools, an antique Lionel train set, and a safe. Mr. and Mrs. Smith had told Mr. Kafka that these items belonged to him, but that he would not get them until they died. From and after June 2009, Gladys Hess and her children began to remove these items from Mrs. Smith's home. Many of these items had been the property of Mr. Smith but had never been administered in probate.

(*Id.* ¶ 30.) Kafka alleges the 2011 Deed was executed by Smith "under the domination and control of Hess," and this deed was also prepared by Goldman. (*Id.* ¶ 31.)

"In December 2014, Mrs. Smith called Mr. Kafka and told him she wanted to change her estate planning documents in Mr. Kafka's favor, but she was housebound and relied on Hess completely. She was also afraid that Hess would stop taking care of her. This fear was particularly strong because Hess had driven away Mrs. Smith's family, friends, and neighbors." (*Id.* ¶ 32.) Later, in February 2015, Smith called Kafka again and told him she wanted Kafka to come to Maryland and change everything back into his name. (*Id.* ¶ 33.)

> Out of courtesy, Kafka contacted Hess and told her of Mrs. Smith's wishes and she agreed. The next morning Hess phoned Mr. Kafka and stated that she had spoken to Mrs. Smith and she was absolutely outraged about any changes. Hess also reminded Kafka of the letter Goldman had sent. On information and belief, Hess used her position of dominance and control to prevent Mrs. Smith from making the desired changes.

(*Id.*)

After Smith died on March 31, 2015, Hess called Kafka at 10:00 p.m. the night before the funeral and informed Kafka the funeral would be the next day at 12:00 p.m. (*Id.* ¶ 34.) Hess told Kafka there was no need for him to attend the funeral. (*Id.*) "Nevertheless, Mr. Kafka travelled 450 miles and arrived in less than 12 hours for the funeral." (*Id.*)

Kafka alleges that when he and his wife arrived at Smith's home, they "received a very cold reception from Hess. At the conclusion of the funeral service and interment, Mr. Kafka, his wife and Hess returned to [Smith's home]. He and his wife were emotionally and physically exhausted and intended to rest the night at the dwelling. However[,] upon arrival, Hess suddenly became irate and hostile and told them to leave immediately." (*Id.* ¶ 35.)

On or about May 27, 2015, Hess filed a Small Estate Petition for Administration with the Register of Wills for Baltimore County and specifically indicated no notice to Kafka would be necessary. (*Id.* ¶ 36.) Consequently, Kafka was not notified of Hess's appointment as the personal representative for Smith's estate. (*Id.*) With the Petition, Hess also filed what was purported to be Smith's last will and testament; the schedule of assets filed with the Petition indicated the only property owned by Smith was a 1997 Mercury Grand Marquis worth $2,584. (*Id.*) No bank accounts were reported. (*Id.* ¶ 37.) Kafka alleges, on information and belief, that Hess received all of the funds from the Bay Vanguard accounts and IRA. (*Id.*) Hess also failed to account for any of the personal property that had been present in Smith's house, such as home furnishings, antiques, motorcycle, safe, train set, guns, and tools, and Hess further failed to account for the more than $300,000 in the Bay Vanguard accounts of which Kafka had been "a joint owner as of the time that Hess shut out Mr. Kafka. On information and belief, these items and funds were taken by Hess, and her children, Linda Zuck, Roland Stader, and Gail A. Kroedel, prior to the death of Mrs. Smith." (*Id.* ¶ 38.) Kafka further alleges, on information and belief that Smith's designation of him as her life insurance beneficiary was changed to remove him and replace him with Hess or one of her children. (*Id.* ¶ 39.) Kafka has not received any proceeds from the Bay Vanguard accounts or the Bay Vanguard IRA. (*Id.* ¶ 40.) All of these allegations are incorporated into each of the five counts of Kafka's counterclaim.

## VII. Analysis of Motion to Dismiss Counterclaim

### A. Count I – Interference with Contract

In this count, Kafka alleges he has suffered damage because Hess interfered with the contracts of Smith and Kafka, specifically, the bank accounts, the insurance policies, and the IRA, by causing Smith to change the beneficiary designation of the IRA and insurance policies and by withdrawing funds from the joint accounts and depositing them in a separate account of which Hess was a joint owner. Hess argues this count is brought outside of the statute of limitations and is also not pled with sufficient plausibility under Federal Rule of Civil Procedure 12(b)(6) or with sufficient particularity under Rule 9(b).

The applicable statute of limitations is three years from the date of the wrong. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West 2017). However, the discovery rule is generally applicable "in all actions and the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981). Hess has argued the statute of limitations as an affirmative defense to Kafka's counterclaim. A motion to dismiss under Rule 12(b)(6) is ordinarily not the proper vehicle for testing the validity of an affirmative defense. *Goodman v. PraxAir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). However, an exception to that rule arises when "all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'" *Id.* (alteration in original; emphasis omitted; citations omitted). Thus, the Court examines the allegations in the counterclaim to determine whether Kafka's cause of action falls within the limitations period or not.

The cause of action of intentional or malicious interference with contract is well recognized in Maryland. "[A] person who induces one of two parties to a contract to break it, intending thereby to injure the other, or to obtain a benefit for himself, does the other an

actionable wrong." *Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins. Co.*, 511 A.2d 492, 497 (Md. 1986) (citing *Knickerbocker Co. v. Gardiner Co.*, 69 A. 405, 408 (Md. 1887)). *See also Wilmington Trust Co. v. Clark*, 424 A.2d 744, 754 (Md. 1981) ("a third party who, without legal justification, intentionally interferes with the rights of a party to a contract, or induces a breach thereof, is liable in tort to the injured contracting party").

Hess has argued, unmeritoriously, that "Kafka has not pled facts to show that a contract existed between him and any third-party, nor has he pled that any such contract was breached." (Hess Defs.' Mot. Dismiss Supp. Mem. 8, ECF No. 18-1.) In fact, Kafka alleges he had been made a joint owner of the two Bay Vanguard accounts. *See generally Morgan Stanley & Co., Inc. v. Andrews*, 123 A.3d 640 (Md. Ct. Spec. App. 2015) (holding rebuttable presumption exists that joint account holders own the funds in an account, but presumption of joint ownership can be rebutted by clear and convincing evidence to contrary). When he was "removed" as a joint owner without his consent, then Bay Vanguard breached its contract with him as an owner of the accounts. Kafka alleges this breach occurred because of Hess's intentional interference.

The counterclaim's allegations indicate Kafka knew in August 2009 that a change had been made in the ownership of the jointly-owned bank accounts at Bay Vanguard. (Counterclaim ¶ 23.) As to those accounts, that is when the limitations period began running on his claim of interference with contract. As for the beneficiary designations for Smith's IRA and life insurance policy, the clock would start running only upon Smith's death, when a beneficiary would first be entitled to these assets. The counterclaim does not indicate Kafka knew of any change to his beneficiary status prior to Smith's death, and even if had known, he would have had no right to enforce his then-contingent status as a beneficiary before Smith died. Thus, the counterclaim affirmatively shows the statute of limitations bars the portion of Count I claiming

interference with the contracts pertaining to the two Bay Vanguard accounts, but it does not show the rest of Count I is barred.

With regard to Rule 12(b)(6), the counterclaim amply alleges that Smith had made Kafka the beneficiary on both the IRA and the life insurance policy and that Hess, by leveraging her confidential relationship with Smith, induced Smith to change her beneficiary designations so that Kafka did not inherit the proceeds, instead enabling Hess or her children to obtain the benefit of those assets. As a third-party beneficiary to the IRA and life insurance policy, Kafka would have had a right to enforce those contracts, *Dickerson v. Longoria*, 995 A.2d 721, 741-42 (Md. 2010), but Hess's interference with those contracts prevented Kafka from enforcing them. That is sufficient to state a claim for relief. To the extent Rule 9(b)'s particularity requirement for pleading a cause of action sounding in fraud may apply to Count I, the counterclaim satisfies that rule's requirements.

### B. Count II – Declaratory Judgment: 2011 Hess Deed

In this count, Kafka seeks to have the 2011 Deed declared null and void based upon Hess's undue influence over Smith. In Kafka's opposition to the Hess Defendants' motion to dismiss, he notes Count II is only included in the event the Court does not uphold the priority of the 2009 Kafka Deed. (Kafka's Opp'n 9, ECF No. 21.) Since the Court is upholding the priority of the 2009 Kafka Deed, Count II is moot.

### C. Count III – Constructive Trust

In this count, Kafka requests the imposition of a constructive trust on all of Smith's assets that would have devolved to him but for Hess's alleged fraud, which resulted in the Hess Defendants acquiring them instead. Hess is correct that no cause of action named constructive trust exists, but it is clear that the counterclaim alleges fraud procured by undue influence, for

which the appropriate remedy is a constructive trust. *See Wimmer v. Wimmer*, 414 A.2d 1254, 1258 (Md. 1980); *City of Annapolis v. West Annapolis Fire and Improvement Co.*, 288 A.2d 151, 155 (Md. 1972). The assets that allegedly should be the subject of a constructive trust are those acquired through the January 15, 2010, will; Hess's power of attorney; transfers of monies to the Hess Defendants during Smith's lifetime; transfers of personal property to the Hess Defendants before and after Smith's death; and changes of beneficiary designations.

As to the Hess Defendants' argument on the statute of limitations,[4] an action as to fraud accrues as of the date of discovery of the fraud. *James v. Weisheit*, 367 A.2d 482, 485 n.4 (Md. 1977) ("deceit actions accrue when the wrong is discovered or when with due diligence it should have been discovered, assuming . . . that all elements of the cause of action exist at that time" (citations omitted)). Since a will speaks only upon the testatrix's death, *Wyeth v. Safe Deposit & Trust Co.*, 4 A.2d 753, 755 (Md. 1939), a suit instituted within three years of Smith's death is timely as to fraud occurring in connection with her will. Likewise, fraud as to the IRA and the life insurance policy would not be complete without Kafka's being deprived of his status as beneficiary upon the occurrence of Smith's death. Kafka's related claims of fraudulent *inter vivos* transfers accrue logically at the time of her death as well because it is only then when, as to Kafka, the fraud took place, *i.e.*, the cause of action would not be complete without damage to Kafka, and that would not occur until the time he would be entitled, but was denied the opportunity, to assume sole ownership of Smith's bank accounts and her personal property. *See James*, 367 A.2d at 484 (one element of fraud action is damage to plaintiff directly resulting

---

[4] "When a case involves concurrent legal and equitable remedies, 'the applicable statute of limitations for the legal remedy is equally applicable to the equitable one.'" *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 985-86 (Md. 2000). A constructive trust is an equitable remedy. *Springer v. Springer*, 125 A. 162, 168-69 (Md. 1924). The constructive trust sought by Kafka is in the same suit as his counts sounding in tort and claiming the legal remedy of damages. Consequently, the Court will apply the three-year statute of limitations to Kafka's claim in Count III.

from defendant's fraudulent act). Although Kafka knew about Hess's power of attorney in 2010, the fraud upon Kafka stemming from Hess's use of the power of attorney was not complete until Smith's death—when the damage to Kafka occurred. All of Count III falls within the statute of limitations.

Even though a higher standard applies for fraud relating to a will as opposed to fraud relating to *inter vivos* transfers, *Upman v. Clarke*, 753 A.2d 4, 5 (Md. 2000), Kafka has satisfactorily alleged enough to satisfy that higher standard under Rule 12(b)(6) as well as Rule 9(b). Count III sufficiently states a claim for relief.

The Hess Defendants have challenged the Court's subject-matter jurisdiction, saying Kafka's counterclaim falls within the probate exception to diversity jurisdiction, but their argument rests upon an incorrect interpretation of that exception. "[T]he probate exception is limited to two categories of cases: (1) those that require the court to probate or annul a will or to administer a decedent's estate, and (2) those that require the court to dispose of property in the custody of a state probate court." *Lee Graham Shopping Ctr., LLC v. Estate of Kirsch*, 777 F.3d 678, 680-81 (4th Cir. 2015). Kafka's suit does not require either of those actions by the Court;[5] consequently, the Court has subject-matter jurisdiction of the counterclaim.

### D. Count IV – Interference with Expected Inheritance

This cause of action has not been officially recognized in Maryland common law, but it also has not been rejected. The Maryland Court of Appeals considered recognition of the tort of interference with expected inheritance in *Anderson v. Meadowcroft*, 661 A.2d 726 (Md. 1995). In *Anderson*, the court noted this tort, which has been recognized in a substantial number of jurisdictions, was oftentimes permitted in other states only when plaintiffs demonstrate exhaustion of probate proceedings or when those proceedings would not have provided adequate

---

[5] The only asset in the probate estate, according to Hess's inventory, was a car worth less than $3,000.

relief. *Id.* at 730. The tort depends upon the element of undue influence, but the complaint in *Anderson* did not adequately allege undue influence, so the court concluded no need had yet arisen to adopt the cause of action in Maryland. *Id.*

A few years after *Anderson*, the Maryland Court of Special Appeals also considered the viability of the tort and concluded "that the Court of Appeals would recognize the tort if it were necessary to afford complete, but traditional, relief." *Geduldig v. Posner*, 743 A.2d 247, 257 (Md. Ct. Spec. App. 1999). The *Geduldig* court also noted,

> We decline to recognize the tort where the sole reason is an expansion of traditional remedies, as opposed to a situation, not before us, where the traditional remedy might be insufficient to correct the pecuniary loss. The question of viability and application of the tort depends on the facts in a given case.
>
> In the case before us, the claims under the tort counts are duplicative of the independent claims based on fraud and undue influence, except for the damage claim that would constitute an expansion of existing law. Based on the rationale articulated in [*Kann v. Kann*, 690 A.2d 509 (Md. 1997)], we decline to recognize the tort in this instance.

743 A.2d at 257 (footnote omitted).

Unlike the plaintiff in *Anderson*, Kafka has adequately alleged undue influence by Hess such that the Hess Defendants acquired various forms of property that should have rightfully gone to Kafka. So that factor is not a hurdle here. To a certain extent, Kafka's claim of fraud in Count III is duplicative of Count IV's claim of intentional interference with expected inheritance since the property he seeks to recover in Count III has the same value as the damages he would recover if he successfully proved Count IV. Under *Geduldig*, he would not be entitled to damages, either compensatory or punitive, beyond the traditional remedy afforded by a constructive trust if the latter constituted a complete remedy. However, a possibility of incomplete remedy exists here since it is unknown if the Hess Defendants have dissipated the assets that properly belonged in Smith's estate. If compensatory damages were necessary to

make up the difference between recoverable assets and those that should be in the estate, then that would meet *Geduldig*'s criteria for recognition of the tort.  In addition, as to limitations, the tort does not accrue until the death of the person from whom a plaintiff expects to inherit; this is so because the tort includes the element of damage to the plaintiff, and damage does not occur until the plaintiff does not receive the expected inheritance upon the decedent's death. Consequently, Count IV properly states a claim for relief under both Rule 12(b)(6) and Rule 9(b).[6]

### E.  Count V – Trespass

In this count, Kafka alleges, "Hess and others at her direction entered upon the Home after the death of Mrs. Smith and deprived Kafka of the possession of the property," and the "trespass was a proximate cause of damages to Kafka."  (Counterclaim ¶¶ 54, 55.)  The count, of course, is based upon Kafka's status of remainderman under the 2009 Deed.

The gist of the action of trespass is injury done to the plaintiff's possession.  *Gent v. Lynch*, 23 Md. 58, 64 (Md. 1865).  A plaintiff's possession may be actual or constructive, but a mere right of entry on lands is insufficient to establish possession "if they be in the actual possession and occupancy of a disseisor."  *Id.* at 64-65.  A disseisee may bring an action of trespass for the original act of disseisin as long as he was in possession of the property at the time of the act of disseisin, but he cannot bring a suit for trespass "for any subsequent injury until he has acquired the possession by re-entry."  *Id.* at 65 (internal quotation marks omitted).

Although Kafka was the owner of the Property upon his mother's death, he was not in possession of it and only came into the house briefly after the funeral and then quickly left when

---

[6]  Hess contends that the essence of Kafka's Count IV is really only a will caveat, and the time has passed under Maryland law for filing such.  If that were so, then the lengthy opinions in *Anderson* and *Geduldig* would have been truncated by a summary ruling on that point, which did not happen.  It is clear the instant counterclaim is not a will caveat.

Hess became hostile to his presence. "[T]he action of trespass [*quare clausum fregit*] . . . will lie upon that possession which the law implies to be in the owner of land, when no other person is, in point of fact, on it. In such case the owner has, constructively, the possession." *Id.* (internal quotation marks omitted). "The holder of a perfect paper title who is not in possession cannot maintain trespass. His remedy is in ejectment. If, however, the plaintiff has a paper title to the whole tract and is in actual possession of part of it, his constructive possession of the remainder is presumed." *McAuliffe v. Lerch*, 57 A.2d 329, 330 (Md. 1948). The counterclaim's allegations clearly indicate Hess was in possession—and Kafka was not—up until the time she found she was unable to sell the Property because of the 2009 deed to Kafka. Kafka does not allege that Hess remained in possession when he came to the house at any time after that. Nor does he allege what damage he suffered when he and Hess were momentarily on the Property at the same time following Smith's funeral. Count V fails to state a claim for relief.

### F. Third-Party Defendants

The Hess Defendants' final argument is that Kafka has not provided allegations that each of the Third-Party Defendants exercised undue influence over Smith and, therefore, they should be dismissed from the case. This argument is without merit. Hess's children are alleged to have assisted Hess in carrying out fraud over a period of time that resulted in the children acquiring valuable property that should have gone to Kafka. Their alleged complicity in Hess's fraud and their benefits from it are sufficient to state a claim for relief against them.

## VIII. Conclusion

By separate order, Kafka's motion for summary judgment will be granted and the Hess Defendants' motion to dismiss the counterclaim and third-party claim will be granted in part and denied in part.

DATED this 6th day of June, 2017.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge